**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION**

| | |
|---|---|
| IN RE:<br><br>**FREIRICH FOODS, INC.,**<br><br>　　　**DEBTOR** | **CASE NO. 24-50204**<br>**CHAPTER 11** |
| **MOTION FOR ORDER GRANTING AUTHORITY**<br>**TO ASSUME EXECUTORY CONTRACT** | |

NOW COMES Freirich Foods, Inc. (the "Debtor") and moves the Court pursuant to § 365 of the Bankruptcy Code and Rule 6006 of the Federal Rules of Bankruptcy Procedure as follows:

1.　　On March 20, 2024 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code and continues in possession of its assets as debtor-in-possession.

2.　　This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, and this matter is a core proceeding under 28 U.S.C. §157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

3.　　The Debtor is a North Carolina corporation that presently conducts its business operations at a production facility located at 815 W. Kerr St., Salisbury, NC (the "Production Facility").  The Debtor is engaged in the business of producing prepared meat products, which it then packages on the Production Facility.

4.　　The Debtor files this motion seeking authorization to assume that certain executory contract between the Debtor and Icon Boilers ("Icon") related to the installation of two (2) boilers within the Production Facility, as evidenced by that certain Proposal dated June 19, 2023 (the

"Proposal") attached hereto as Exhibit A. The boilers are essential to the Debtor's business operations.

5.    Pursuant to the terms of the Proposal, on or about June 20, 2023, the Debtor engaged Icon to install two boilers within the Production Facility for an estimated cost of $193,400 plus shipping costs and sales tax.  Upon information and belief, based upon communications with counsel for Icon:

a.    Icon engaged Versa-Tek Enterprises, L.L.C. (the "Sub") as a subcontractor to complete portions of the installation of the boilers and the Sub completed those duties in late 2023.  Icon retained the responsibility to complete certain portions of the installation of the boilers, including performing pre-start, start-up, and commissioning work of the boilers.

b.    On December 27 and December 28, 2023, Icon employees worked on performing such pre-start, startup, and commissioning tasks, but were not yet able to get the boilers operational.

c.    On January 5, 2024, Icon returned to the Production Facility to address boiler performance issues identified by the Debtor and noted an installation error made by the Sub.  The Sub corrected the installation errors between January 5, 2024, and February 6, 2024.

d.    On February 6, 2024, Icon again returned to the Production Facility to recommission the boilers after the work completed by the Sub, however, Icon identified ongoing issues, and thus ordered additional parts necessary to complete the installation and commissioning of the boilers.  The Debtor filed its petition commencing this bankruptcy case prior to Icon scheduling a date to complete the work and commission the boilers.

e.      Until the boilers are commissioned, they cannot safely be operated within the Production Facility.  Once the boilers are commissioned, all of Icon's obligations under the Proposal shall be complete except for contractual obligations with respect to certain warranties as well as a separate service agreement arrangement between the Debtor and Icon.

6.      In anticipation of the completion of the work set forth in the Proposal, Icon issued an invoice to the Debtor in the amount of $211,218.00, which consisted of $193,400.00 as set forth in the Proposal, $4,000.00 for shipping of equipment, and sales tax of $13,818.00 (the "Installation Invoice").  The Debtor also has outstanding two (2) additional invoices for (a) a service call on November 8, 2023, and (b) a semi-annual invoice for preventative maintenance services on other boiler equipment at the Production Facility.  The additional invoices are for $1,511.38 and $2,227.74 respectively, totaling $3,739.12 (the "Additional Invoices" and together with the Installation Invoice, the "Invoices").

7.      Under the Proposal, both Debtor and Icon have remaining unperformed obligations—Icon is to perform startup and commissioning services to activate and enable the boilers and the Debtor is to pay the amount set forth in the Invoices.

8.      The Debtor seeks authorization to immediately assume the Proposal as an executory contract, for the following reasons:

a.      Icon and the Debtor are parties to an executory contract outlined in the Proposal.

b.      The Debtor needs the boilers to be operational in order to conduct its business.

c.      Icon believes it can complete its obligations under the Proposal in as little as one day of work on the boilers, at which point the boilers will be operational allowing the Debtor to resume its business activities.

d.      Delay in electing to assume the Proposal would also delay getting the boilers operational, harming the business of the Debtor.  The Debtor currently has one operative boiler that is struggling to handle the current load, and if that boiler failed all operations would cease.

9.      Under § 365(b)(1), if there has been a default in an executory contract, the default must be cured before the contract may be assumed.  The Debtor, by failing to pay the Invoices, is currently in default of its obligations under the Proposal.

10.      The Debtor believes that (a) the boilers are essential to its business and (b) Icon is the only party properly suited to complete the installation and commission of the boilers.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order authorizing the assumption of the executory contract created under the Proposal, authorizing the payment of the Invoices within fifteen (15) days of the completion of the work required under the Proposal, determining that any portion of the Invoices that are not timely paid shall be granted administrative priority, and granting such other relief as is just and equitable.

Date:  April 16, 2024

/s/ John A. Northen

**Counsel for the Debtor:**
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25449
vlp@nbfirm.com
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441

## EXHIBIT A
Proposal Dated June 19, 2023



# *Proposal*

(Valid for 30 days from Proposal date, see section 4 below Pricing and Taxes)

*PROPRIETARY AND CONFIDENTIAL PROPERTY OF ICON BOILER*

*DISTRIBUTION TO OTHER THAN THE NAMED RECIPIENT IS PROHIBITED*

*© 2020 Icon Boiler    All rights reserved*

**Prepared For:**
Paul Bardinas
704-798-3039
paulbardinas@aol.com

Remittance Address:
Freirich Foods Inc
815 W Kerr St,
Salisbury, NC 28144

**Delivery Terms:**
See below

*Date:* 6/19/23

*Proposal Number:* 119562

*Job Name:*
Boiler replacement project

*Payment Terms:*
Net 30 Days

---

Icon Boiler is pleased to provide the following proposal for your review and approval.

Equipment.....................$100,300
Installation/startup...........$93,100
**Total.............................$193,400**

Note:
- Does not included shipping and taxes
- Estimated lead time 10-12 weeks

Equipment:
(2) Boilers
Triad Natural Gas 1600 High Pressure Steam

The following trim items shall be integral to the boiler and factory installed, plumbed, and wired as appropriate:
- Control relay to work in conjunction with two Low Water Cut-offs
- Two pressure controls to manage overall operation of the boiler.
- Operating Pressure Limit Control.
- Safety Pressure High Limit Control that is a second high -limit with manual reset that prevents burner operation above nominal operating conditions.
- Low Water Lev el Control (float type) that prevents operations if the boiler water level falls below a nominal operating level.
- Safety Low Water Cut-off with Manual Reset
- Steam outlet isolation and check valve
- Feedwater isolation and check valve

5/25/22

- Slow and fast opening bottom
- Surface blowdown globe valve
- Pressure gauge of suitable range for monitoring operations.
- High Visibility Call for Heat Light to indicate when the boiler circuitry has been activated.
- On/Off switch.
- ASME relief valve with a setting of 150 psi.

Factory mounted & Hydro tested ASME Trim Valve Package:
- 51-100psi operating pressure with 4" flanged steam outlet.
- Slow & quick opening bottom blowdown valves,
- Surface blowdown valve,
- Feedwater gate & check valves,
- Steam outlet gate valve

Burner
Power Flame JR50
- Honeywell flame safeguard - UV Scanner.
- Pre-Piped and Wired Gas Train
- High Gas Pressure Switch With Manual Reset For Gas Train, Vent less, Indicator.

Barometric Stack Damper MG2 -10
- 10" -- Field Mounted

Feedwater system:
- 2 new pumps
- Sparge to pre-heat feedwater

Flue Venting:

| Qty Item No | Description |
|---|---|
| 8 S-650 | High Temperature Sealant Silicone / max 650°F |
| 4 CAX1-8SWAC | SINGLE ADAPT CAX1-8" 304 |
| 2 CAX1-8T90CE | TEE CAX1-8" 90 DEG 304-GALV |
| 2 CAX1-8AP | ANCHOR PLATE CAX1-8" |
| 2 CAX1-8E45CE | ELBOW CAX1-8" 45 DEG 304-GALV |
| 1 CAX1-16TCCE | TEE CAP CAX1-16" 304-GALV |
| 2 CAX1-16T45B8CE | TEE CAX1-16" TO 8" 45 DEG 304-GALV |
| 3 CAX1-16AP | ANCHOR PLATE CAX1-16" |
| 2 CAX1-16LVCE | VARIABLE LENGTH CAX1-16" 304-GALV |
| 3 CAX1-16E90CE | ELBOW CAX1-16" 90 DEG 304-GALV |
| 2 CAX1-16L18CE | LENGTH CAX1-16" X 18" 304-GALV |
| 1 CAX1-16LACE | ADJUST LENGTH CAX1-16" 304-GALV |
| 1 CAX1-16WTE | WALL THIMBLECAX1-16" GALV |
| 9 CAX1-16L36CE | LENGTH CAX1-16" X 36" 304-GALV |
| 2 CAX1-16WGHD | WALL GUIDE HEAVY DUTY CAX1-16" |
| 1 CAX1-16WSHD | WALL SUPPORT H-D CAX1-16" |
| 1 CAX1-16CRCBC | CONE CAP WITH SCREEN CAX1-16" 304 |



Installation:
INSTALL TWO (2) VERTICAL 40HP BOILERS
WE PROPOSE TO FURNISH LABOR AND MATERIAL TO PERFORM THE FOLLOWING SCOPE OF WORK:
1. DISCONNECT EXISTING CONDENSATE TANK AND SLIDE OUT OF POSITION TO ALLOW OLD BOILER TO BE REMOVED AND NEW BOILERS TO BE INSTALLED INTO POSITION (WORK TO BE DONE ON OVERTIME).
2. RECONNECT EXISTING CONDENSATE TANK AND INSTALL NEW TAPS FOR TWO (2) NEW PUMPS (WORK TO BE DONE ON OVERTIME).
3. REMOVE EXISTING FLUE VENTING AND INSTALL CONMPLETE NEW VENTING.
4. INSTALL REGULATORS AND GAS PIPING TO BOTH NEW BOILERS.
5. INSTALL ALL BLOWDOWN PIPING FROM BOTH BOILERS TO EXISTING DRAIN.
6. INSTALL ALL FEEDWATER PIPING TO BOTH BOILERS.

5/25/22

7. INSTALL ALL PIPING ASSOCIATED WITH NEW CONDENSATE PUMPS PROVIDED BY ICON BOILER.
8. INSTALL RELIEF VALVE PIPING THROUGH EXTERIOR WALL.
9. INSTALL BOTH STEAM DISCHARGE LINES AND TIE INTO EXISTING PLANT STEAM LINE.
10. PERFORM ALL POWER WIRING TO BOTH BOILERS.
11. ENGINEER AND FABRICATE CONTROL PANEL FOR CONDENSATE PUMP SELECTION AND BACKUP PUMP SELECTION.
12. SUPPLY ELECTRICAL SCHEMATICS FOR NEW CONTROL PANEL.
13. ASSIST ICON BOILER WITH START UP AND CHECKOUT OF COMPLETE SYSTEM.
***NOTE: LULL SUPPLIED BY VERSA-TEK***

Should you have any further questions, please do not hesitate to contact me at (864) 314-0576.

Thank you,

Kent Pfitzer
Sales Engineer

Please send all purchase orders to kent.pfitzer@iconboiler.com

| Tax Status: | Taxable ☐<br>Exempt ☐ | IF EXEMPT PLEASE SUBMIT COMPLETED TAX EXEMPTION CERTIFICATE WITH YOUR SIGNED PROPOSAL OR WITH YOUR PURCHASING DOCUMENTS, KEEP YOUR ORIGINAL ON FILE IN THE OFFICE. YOU WILL BE CHARGED TAX IF A VALID EXEMPTION CERTIFICATE IS NOT ON FILE BEFORE EQUIPMENT, PARTS OR SERVICES ARE PROVIDED. |
|---|---|---|

**This proposal and pricing are based on shipment of all products (not including field labor).**

**This proposal is subject to your acceptance of the attached Icon Boiler terms and conditions (Equipment).**

| CUSTOMER ACCEPTANCE | ICON BOILER ACCEPTANCE |
|---|---|
| _(signature)_ | |
| Authorized Representative | Submitted By: Kent Pfitzer<br>Cell: (561) 980-4099<br>Office: (336) 378-0670 |
| Paul Bardinas<br>Printed Name | |
| President<br>Title | Authorized Representative |
| Purchase Order  Paul | |
| Acceptance Date  6/20/23 | Title |
| | Signature Date |

**TERMS AND CONDITIONS - COMMERCIAL EQUIPMENT**
**"Company" shall mean Icon Boiler Sales and Service Inc..**
**1.  Acceptance.  These terms and conditions are an integral part of Company's offer and form the basis of any agreement (the "Agreement") resulting from Company's proposal (the "Proposal") for the sale of the described commercial equipment and any ancillary services (the "Equipment").  COMPANY'S TERMS AND CONDITIONS ARE SUBJECT TO PERIODIC CHANGE OR AMENDMENT.** The Proposal is subject to acceptance in writing by the party to whom this offer is made or an authorized agent ("Customer") delivered to Company within 30 days from the date of the Proposal.  If Customer accepts the Proposal by placing an order, without the addition of any other terms and conditions of sale or any other modification, Customer's order shall be deemed acceptance of the Proposal subject to Company's terms and conditions. If Customer's order is expressly conditioned upon Company's acceptance or assent to terms and/or conditions other than those expressed herein, return of such order by Company with Company's terms and conditions attached or referenced serves as Company's notice of objection to Customer's terms and as Company's counter-offer to provide Equipment in accordance with the Proposal and the Company's terms and conditions.  If Customer does not reject or object in writing to Company within 10 days, Company's counter-offer will be deemed accepted.  Customer's acceptance of the Equipment will in any event constitute an acceptance by Customer of Company's terms and conditions.  This Agreement is subject to credit approval by Company.  Upon disapproval of credit, Company may delay or suspend performance or, at its option, renegotiate prices and/or terms and conditions with Customer.  If Company and Customer are unable to agree on such revisions, this Agreement shall be cancelled without any liability.
**2.  Connected Services.**  In addition to these terms and conditions, the Connected Services Terms of Service ("Connected Services Terms"), available at https://www.Icon Boiler.com/Icon BoilerConnectedServicesTerms, as updated from time to time, are incorporated herein by reference and shall apply to the extent that Company provides Customer with Connected Services, as defined in the Connected Services Terms.
**3.  Title and Risk of Loss.**  All Equipment sales with destinations to Canada or the U.S. shall be made as follows: FOB Company's U.S. manufacturing facility or warehouse (full freight allowed). Title and risk of loss or damage to Equipment will pass to Customer upon tender of delivery of such to carrier at Company's U.S. manufacturing facility or warehouse.

**4.  Pricing and Taxes.**  Within thirty (30) days following Customer acceptance of the Proposal without addition of any other terms and conditions of sale or any modification, Customer shall provide notification of release for immediate production at Company's factory. Prices for Equipment are subject to change at any time prior to shipment to reflect any cost increases related to the manufacture, supply, and shipping of Equipment. This includes, but is not limited to, cost increases in raw materials, supplier components, labor, utilities, freight, logistics, wages and benefits, regulatory compliance, or any other event beyond Company's control. If shipment is delayed due to Customer's actions, Company may also charge Customer with storage fees. If a release is not received within 6 months following order acceptance, Company reserves the right to cancel any order. Company shall be entitled to equitable adjustments in the contract price to reflect any cost increases as set forth above and will provide notice to Customer prior to the date for which the increased price is to be in effect for the applicable customer contract. In no event will prices be decreased. The price of Equipment does not include any present or future foreign, federal, state, or local property, license, privilege, sales, use, excise, value added, gross receipts or other like taxes or assessments. Such amounts will be itemized separately to Customer, who will make prompt payment to Company. Company will accept valid exemption documentation for such taxes and assessments from Customer, if applicable. All prices include packaging in accordance with Company's standard procedures. Charges for special packaging, crating or packing are the responsibility of Customer.
**5. Delivery and Delays.** Delivery dates are approximate and not guaranteed. Company will use commercially reasonable efforts to deliver the Equipment on or before the estimated delivery date, will notify Customer if the estimated delivery dates cannot be honored, and will deliver the Equipment and services as soon as practicable thereafter. In no event will Company be liable for any damages or expenses caused by delays in delivery.
**6.  Performance.**  Company shall be obligated to furnish only the Equipment described in the Proposal and in submittal data (if such data is issued in connection with the order). Company may rely on the acceptance of the Proposal, and in submittal data as acceptance of the suitability of the Equipment for the particular project or location. Unless specifically stated in the Proposal, compliance with any local building codes or other laws or regulations relating to specifications or the location, use or operation of the Equipment is the sole responsibility of Customer. If Equipment is tendered that does not fully comply with the provisions of this Agreement, and Equipment is rejected by Customer, Company will have the right to cure within a reasonable time after notice thereof by substituting a conforming tender whether or not the time for performance has passed.
**7. Force Majeure.**  Company's duty to perform under this Agreement and the Equipment prices are contingent upon the non-occurrence of an Event of Force Majeure.  If the Company shall be unable to carry out any material obligation under this Agreement due to an Event of Force Majeure, this Agreement shall at Company's election (i) remain in effect but Company's obligations shall be suspended until the uncontrollable event terminates or (ii) be terminated upon 10 days notice to Customer, in which event Customer shall pay Company for all parts of the Work furnished to the date of termination.  An "Event of Force Majeure" shall mean any cause or event beyond the control of Company.  Without limiting the foregoing, "Event of Force Majeure" includes: acts of God; acts of terrorism, war or the public enemy; flood; earthquake; tornado; storm; fire; civil disobedience; pandemic insurrections; riots; labor/labour disputes; labor/labour or material shortages; sabotage; restraint by court order or public authority (whether valid or invalid); and action or non-action by or inability to obtain or keep in force the necessary governmental authorizations, permits, licenses, certificates or approvals if not caused by Company; and the requirements of any applicable government in any manner that diverts either the material or the finished product to the direct or indirect benefit of the government.
**8.  Limited Warranty.**  Company warrants the Equipment manufactured by Company for a period of the lesser of 12 months from initial start-up or 18 months from date of shipment, whichever is less, against failure due to defects in material and manufacture and that it has the capacities and ratings set forth in Company's catalogs and bulletins ("Warranty").  **Equipment manufactured by Company that includes required start-up and sold in North America will not be warranted by Company unless Company performs the Equipment startup.** Exclusions from this Warranty include damage or failure arising from: wear and tear; corrosion, erosion, deterioration; modifications made by others to the Equipment; repairs or alterations by a party other than Company that adversely affects the stability or reliability of the Equipment; vandalism; neglect; accident; adverse weather or environmental conditions; abuse or improper use; improper installation; commissioning by a party other than Company; unusual physical or

electrical or mechanical stress; operation with any accessory, equipment or part not specifically approved by Company; refrigerant not supplied by Company; and/or lack of proper maintenance as recommended by Company. Company shall not be obligated to pay for the cost of lost refrigerant or lost product. Company's obligations and liabilities under this Warranty are limited to furnishing replacement equipment or parts, at its option, FCA (Incoterms 2000) factory or warehouse (f.o.b. factory or warehouse for US domestic purposes) at Company-designated shipping point, freight-allowed to Company's warranty agent's stock location, for all non-conforming Company-manufactured Equipment (which have been returned by Customer to Company. Returns must have prior written approval by Company and are subject to restocking charge where applicable. Equipment, material and/or parts that are not manufactured by Company are not warranted by Company and have such warranties as may be extended by the respective manufacturer. **COMPANY MAKES NO REPRESENTATION OR WARRANTY, OF ANY KIND, INCLUDING WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE, IS MADE REGARDING PREVENTING, ELIMINATING, REDUCING OR INHIBITING ANY MOLD, FUNGUS, BACTERIA, VIRUS, MICROBIAL GROWTH, OR ANY OTHER CONTAMINANTS (INCLUDING COVID-19 OR ANY SIMILAR VIRUS) (COLLECTIVELY, "CONTAMINANTS"), WHETHER INVOLVING OR IN CONNECTION WITH EQUIPMENT, ANY COMPONENT THEREOF, SERVICES OR OTHERWISE. IN NO EVENT SHALL ICON BOILER HAVE ANY LIABILITY FOR THE PREVENTION, ELIMINATION, REDUCTION OR INHIBITION OF THE GROWTH OR SPREAD OF SUCH CONTAMINANTS INVOLVING OR IN CONNECTION WITH ANY EQUIPMENT, ANY COMPONENT THEREOF, SERVICES OR OTHERWISE AND CUSTOMER HEREBY SPECIFICALLY ACKNOWLDGES AND AGREES THERETO.** No warranty liability whatsoever shall attach to Company until Customer's complete order has been paid for in full and Company's liability under this Warranty shall be limited to the purchase price of the Equipment shown to be defective. Additional warranty protection is available on an extra-cost basis and must be in writing and agreed to by an authorized signatory of the Company. **EXCEPT FOR COMPANY'S WARRANTY EXPRESSLY SET FORTH HEREIN, COMPANY DOES NOT MAKE, AND HEREBY EXPRESSLY DISCLAIMS, ANY WARRANTIES, EXPRESS OR IMPLIED CONCERNING ITS PRODUCTS, EQUIPMENT OR SERVICES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF DESIGN, MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, OR OTHERS THAT ARE ALLEGED TO ARISE FROM COURSE OF DEALING OR TRADE.**

**9. Indemnity.** To the fullest extent permitted by law, Company and Customer shall indemnify, defend and hold harmless each other from any and all claims, actions, costs, expenses, damages and liabilities, including reasonable attorneys' fees, resulting from death or bodily injury or damage to real or personal property, to the extent caused by the negligence or misconduct of their respective employees or other authorized agents in connection with their activities within the scope of this Agreement. Neither party shall indemnify the other against claims, damages, expenses or liabilities to the extent attributable to the acts or omissions of the other party. If the parties are both at fault, the obligation to indemnify shall be proportional to their relative fault. The duty to indemnify will continue in full force and effect, notwithstanding the expiration or early termination hereof, with respect to any claims based on facts or conditions that occurred prior to expiration or termination.

**10. Insurance.** Upon request, Company will furnish evidence of its standard insurance coverage. If Customer has requested to be named as an additional insured under Company's insurance policy, Company will do so but only subject to Company's manuscript additional insured endorsement under its primary Commercial General Liability policies. In no event does Company waive any rights of subrogation.

**11. Customer Breach.** Each of the following events or conditions shall constitute a breach by Customer and shall give Company the right, without an election of remedies, to terminate this Agreement, require payment prior to shipping, or suspend performance by delivery of written notice: (1) Any failure by Customer to pay amounts when due; or (2) any general assignment by Customer for the benefit of its creditors, or if Customer becomes bankrupt or insolvent or takes the benefit of any statute for bankrupt or insolvent debtors, or makes or proposes to make any proposal or arrangement with creditors, or if any steps are taken for the winding up or other termination of Customer or the liquidation of its assets, or if a trustee, receiver, or similar person is appointed over any of the assets or interests of Customer; (3) Any representation or warranty furnished by Customer in connection with this Agreement is false or misleading in any material respect when made; or (4) Any failure by Customer to perform or comply with any material provision of this Agreement. Customer shall be liable to the Company for all Equipment furnished and all damages sustained by Company (including lost profit and overhead).

**12. Limitation of Liability.** NOTWITHSTANDING ANYTHING TO THE CONTRARY, IN NO EVENT SHALL COMPANY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT CONSEQUENTIAL, OR PUNITIVE OR EXEMPLARY DAMAGES (INCLUDING WITHOUT LIMITATION REFRIGERANT LOSS, BUSINESS INTERRUPTION, LOST DATA, LOST REVENUE, LOST PROFITS) EVEN IF A PARTY HAS BEEN ADVISED OF SUCH POSSIBLE DAMAGES OR IF SAME WERE REASONABLY FORESEEABLE AND REGARDLESS OF WHETHER THE CAUSE OF ACTION IS FRAMED IN CONTRACT, NEGLIGENCE, ANY OTHER TORT, WARRANTY, STRICT LIABILITY, OR PRODUCT LIABILITY). In no event will Company's liability in connection with the provision of products or services or otherwise under this Agreement exceed the entire amount paid to Company by Customer under this Agreement.

**13. COVID-19 LIMITATION ON LIABILITY**
The transmission of COVID-19 may occur in a variety of ways and circumstances, many of the aspects of which are currently not known. HVAC systems, products, services and other offerings have not been tested for their effectiveness in reducing the spread of COVID-19, including through the air in closed environments. **IN NO EVENT WILL ICON BOILER BE LIABLE UNDER THIS AGREEMENT OR OTHERWISE FOR ANY ACTION OR CLAIM, WHETHER BASED ON WARRANTY, CONTRACT, TORT OR OTHERWISE, FOR ANY BODILY INJURY (INCLUDING DEATH) OR ANY OTHER LIABILITIES, DAMAGES OR COSTS RELATED TO COVID-19 (INCLUCING THE SPREAD, TRANSMISSION OR CONTAMINATION THEREOF) (COLLECTIVELY, "COVID-19 LIABILITIES") AND CUSTOMER HEREBY SPECIFICALLY RELEASES ICON BOILER FROM ANY SUCH COVID-19 LIABILITIES.**

**14. Nuclear Liability.** In the event that the Equipment sold hereunder is to be used in a nuclear facility, Customer will, prior to such use, arrange for insurance or governmental indemnity protecting Company against all liability and hereby releases and agrees to indemnify Company and its suppliers for any nuclear damage, including loss of use, in any manner arising out of a nuclear incident, whether alleged to be due, in whole or in part to the negligence or otherwise of Company or its suppliers.

**15. Intellectual Property; Patent Indemnity.** Company retains all ownership, license and other rights to all patents, trademarks, copyrights, trade secrets and other intellectual property rights related to the Equipment, and, except for the right to use the Equipment sold, Customer obtains no rights to use any such intellectual property. Company agrees to defend any suit or proceeding

---

brought against Customer so far as such suit or proceeding is solely based upon a claim that the use of the Equipment provided by Company constitutes infringement of any patent of the United States of America, provided Company is promptly notified in writing and given authority, information and assistance for defense of same. Company will, at its option, procure for Customer the right to continue to use said Equipment, or modify it so that it becomes non-infringing, or replace same with non-infringing Equipment, or to remove said Equipment and to refund the purchase price. The foregoing will not be construed to include any Agreement by Company to accept any liability whatsoever in respect to patents for inventions including more than the Equipment furnished hereunder, or in respect of patents for methods and processes to be carried out with the aid of said Equipment. The provision of Equipment by Company does not convey any license, by implication, estoppel, or otherwise, under patent claims covering combinations of said Equipment with other devices or elements. The foregoing states the entire liability of Company with regard to patent infringement. Notwithstanding the provisions of this paragraph, Customer will hold Company harmless against any expense or loss resulting from infringement of patents or trademarks arising from compliance with Customer's designs or specifications or instructions.

**16. Cancellation.** Equipment is specially manufactured in response to orders. An order placed with and accepted by Company cannot be delayed, canceled, suspended, or extended except with Company's written consent and upon written terms accepted by Company that will reimburse Company for and indemnify Company against loss and provide Company with a reasonable profit for its materials, time, labor, services, use of facilities and otherwise. Customer will be obligated to accept any Equipment shipped, tendered for delivery or delivered by Company pursuant to the order prior to any agreed delay, cancellation, suspension or extension of the order. Any attempt by Customer to unilaterally revoke, delay or suspend acceptance for any reason whatever after it has agreed to delivery of or accepted any shipment shall constitute a breach of this Agreement. For purposes of this paragraph, acceptance occurs by any waiver of inspection, use or possession of Equipment, payment of the invoice, or any indication of exclusive control exercised by Customer.

**17. Invoicing and Payment.** Unless otherwise agreed to in writing by Company, equipment shall be invoiced to Customer upon tender of delivery thereof to the carrier. Customer shall pay Company's invoices within net 30 days of shipment date. Company reserves the right to add to any account outstanding for more than 30 days a service charge equal to the lesser of the maximum allowable legal interest rate or 1.5% of the principal amount due at the end of each month. Customer shall pay all costs (including attorneys' fees) incurred by Company in attempting to collect amounts due and otherwise enforcing these terms and conditions. If requested, Company will provide appropriate lien waivers upon receipt of payment. Company may at any time decline to ship, make delivery or perform work except upon receipt of cash payment, letter of credit, or security, or upon other terms and conditions satisfactory to Company. Customer agrees that, unless Customer makes payment in advance, Company will have a purchase money security interest in all Equipment to secure payment in full of all amounts due Company and its order for the Equipment, together with these terms and conditions, form a security agreement (as defined by the UCC). Customer will keep the Equipment free of all taxes and encumbrances, shall not remove the Equipment from its original installation point and shall not assign or transfer any interest in the Equipment until all payments due Company have been made. The purchase money security interest granted herein attaches upon Company's acceptance of Customer's order and on receipt of the Equipment described in the accepted Proposal but prior to its installation. The parties have no agreement to postpone the time for attachment unless specifically noted in writing on the accepted order. Customer will have no rights of set off against any amounts, which become payable to Company under this Agreement or otherwise.

**18. Claims.** Company will consider claims for concealed shortages in shipments or rejections due to failure to conform to an order only if such claims or rejections are made in writing within 15 days of delivery and are accompanied by the packing list and, if applicable, the reasons in detail why the Equipment does not conform to Customer's order. Upon receiving authorization and shipping instructions from authorized personnel of Company, Customer may return rejected Equipment, transportation charges prepaid, for replacement. Company may charge Customer any costs resulting from the testing, handling, and disposition of any Equipment returned by Customer which are not found by Company to be nonconforming. All Equipment damaged during shipment and all claims relating thereto must be made with the freight carrier in accordance with such carrier's policies and procedures. Claims for Equipment damaged during shipment are not covered under the warranty provision stated herein.

**19. Export Laws.** The obligation of Company to supply Equipment under this Agreement is subject to the ability of Company to supply such items consistent with applicable laws and regulations of the United States and other governments. Company reserves the right to refuse to enter into or perform any order, and to cancel any order, under this Agreement if Company in its sole discretion determines that performance of the transaction to which such order relates would violate any such applicable law or regulation. Customer will pay all handling and other similar costs from Company's factories including the costs of freight, insurance, export clearances, import duties and taxes. Customer will be "exporter of record" with respect to any export from the United States of America and will perform all compliance and logistics functions in connection therewith and will also comply with all applicable laws, rules and regulations. Customer understands that Company and/or the Equipment are subject to laws and regulations of the United States of America which may require licensing or authorization for and/or prohibit export, re-export or diversion of Company's Equipment to certain countries, and agrees it will not knowingly assist or participate in any such diversion or other violation of applicable United States of America laws and regulations. Customer agrees to hold harmless and indemnify Company for any damages resulting to Customer or Company from a breach of this paragraph by Customer.

**20. General.** Except as provided below, to the maximum extent provided by law, this Agreement is made and shall be interpreted and enforced in accordance with the laws of the state of North Carolina without regard to its conflict of law principles that might otherwise call for the application of a different state's or province's law. Any action or suit arising out of or related to this Agreement must be commenced within one year after the cause of action has accrued. To the extent the Equipment is being used at a site owned and/or operated by any agency of the Federal Government, determination of any substantive issue of law shall be according to the Federal common law of Government contracts as enunciated and applied by Federal judicial bodies and boards of contract appeals of the Federal Government. This Agreement contains all of the agreements, representations and understandings of the parties and supersedes all previous understandings, commitments or agreements, oral or written, related to the subject matter hereof. This Agreement may not be amended, modified or terminated except by a writing signed by the parties hereto. No documents shall be incorporated herein by reference except to the extent Company is a signatory thereon. If any term or condition of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, all other terms and conditions of this Agreement will nevertheless remain in full force and effect as long as the economic or legal substance of the transaction contemplated hereby is not affected in a manner adverse to any party hereto. Customer may not assign, transfer, or convey this

5/25/22

Agreement, or any part hereof, or its right, title or interest herein, without the written consent of the Company. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of Customer's permitted successors and assigns. This Agreement may be executed in several counterparts, each of which when executed shall be deemed to be an original, but all together shall constitute but one and the same Agreement. A fully executed facsimile copy hereof or the several counterparts shall suffice as an original.

**21. Equal Employment Opportunity/Affirmative Action Clause.** Company is a federal contractor that complies fully with Executive Order 11246, as amended, and the applicable regulations contained in 41 C.F.R. Parts 60-1 through 60-60, 29 U.S.C. Section 793 and the applicable regulations contained in 41 C.F.R. Part 60-741; and 38 U.S.C. Section 4212 and the applicable regulations contained in 41 C.F.R. Part 60-250 Executive Order 13496 and Section 29 CFR 471, appendix A to subpart A, regarding the notice of employee rights.

**22.  U.S. Government Work.**

**The following provision applies only to direct sales by Company to the US Government.**  The Parties acknowledge that Equipment ordered and delivered under this Agreement are Commercial Items as defined under Part 12 of the Federal Acquisition Regulation (FAR). In particular, Company agrees to be bound only by those Federal contracting clauses that apply to "commercial" suppliers and that are contained in FAR 52.212-5(e)(1).

**The following provision applies only to indirect sales by Company to the US Government.** As a Commercial Item Subcontractor, Company accepts only the following mandatory flow down provisions:  52.219-8; 52.222-26; 52.222-35; 52.222-36; 52.222-39; 52.247-64.  If the sale of the Equipment is in connection with a U.S. Government contract, Customer certifies that it has provided and will provide current, accurate, and complete information, representations and certifications to all government officials, including but not limited to the contracting officer and officials of the Small Business Administration, on all matters related to the prime contract, including but not limited to all aspects of its ownership, eligibility, and performance. Anything herein notwithstanding, Company will have no obligations to Customer unless and until Customer provides Company with a true, correct and complete executed copy of the prime contract.  Upon request, Customer will provide copies to Company of all requested written communications with any government official related to the prime contract prior to or concurrent with the execution thereof, including but not limited to any communications related to Customer's ownership, eligibility or performance of the prime contract.  Customer will obtain written authorization and approval from Company prior to providing any government official any information about Company's performance of the work that is the subject of the Proposal or this Agreement, other than the Proposal or this Agreement.

**23. Limited Waiver of Sovereign Immunity.**  If Customer is an Indian tribe,  Customer, whether acting in its capacity as a government, governmental entity, a duly organized corporate entity or otherwise, for itself and for its agents, successors, and assigns: (1) hereby provides this limited waiver of its sovereign immunity as to any damages, claims, lawsuit, or cause of action (herein "Action") brought against Customer by Company and arising or alleged to arise out of the furnishing by Company of any product or service under this Agreement, whether such Action is based in contract, tort, strict liability, civil liability or any other legal theory; (2) agrees that jurisdiction and venue for any such Action shall be proper and valid (a) if Customer is in the U.S., in any state or United States court located in the state in which Company is performing this Agreement or (b) if Customer is in Canada, in the superior court of the province or territory in which the work was performed; (3) expressly consents to such Action, and waives any objection to jurisdiction or venue; (4) waives any requirement of exhaustion of tribal court or administrative remedies for any Action arising out of or related to this Agreement; and (5) expressly acknowledges and agrees that Company is not subject to the jurisdiction of Customer's tribal court or any similar tribal forum, that Customer will not bring any action against Company in tribal court, and that Customer will not avail itself of any ruling or direction of the tribal court permitting or directing it to suspend its payment or other obligations under this Agreement.  The individual signing on behalf of Customer warrants and represents that such individual is duly authorized to provide this waiver and enter into this Agreement and that this Agreement constitutes the valid and legally binding obligation of Customer, enforceable in accordance with its terms.

1-26.130-4 (0720)
Supersedes 1-26.130-4 (0620)



| BOILER CONNECTIONS | |
|---|---|
| A.(1) STEAM OUTLET | 4" NPT |
| B.(2) LWCO | 1" NPT |
| C.(1) ALWCO | 3/4" NPT |
| D.(1) SAFETY VALVE | 1" NPT |
| E.(1) BOILER BLOWDOWN | 1" NPT |
| F.(1) PRESSURETROL | 3/4" NPT |
| G.(1) FEEDWATER | 1" NPT |
| H.(4) INSPECTION | 2" NPT |
| J.(1) SIGHTPORT | 2" PIPE |
| K.(1) SURFACE BLOWDOWN | 1" NPT |
| L.(2) SIGHT GLASS | 1/2" NPT |
| M.(1) OVERFLOW | 1" NPT |
| N.( ) | |
| P.( ) | |
| Q.( ) | |
| R.( ) | |
| S.( ) | |

| RATINGS & CAPACITIES | |
|---|---|
| RATED INPUT | 1700 MBH |
| GROSS OUTPUT | 1355 MBH |
| DESIGN PRESSURE | 150 PSIG |
| STEAM (FROM & AT 212° F) | 1320 Lbs/Hr |
| HEAT RELEASE: (FURNACE ONLY) | 172,697 BTU/CuFt |
| HEATING SURFACE (ASME) | 132 SqFt |
| FURNACE HEATING SURFACE | 14.97 SqFt |
| FURNACE VOLUME | 9.26 CuFt |
| STEAMING VOLUME | 4.46 CuFt |
| STEAM RELEASE AREA | 3.93 CuFt |

WATER CAPACITY:

| | | | |
|---|---|---|---|
| (FULL) | 116.1 Gals | @ | 966 Lbs |
| (NWL) | 82.8 Gals | @ | 689 Lbs |
| SHIPPING WEIGHT: | 2,300 Lbs | | |

| LTR | DATE | REVISION | BY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

REPRESENTATIVE:
?

PROJECT:
?

NOTES
1. ALL CONTROLS MOUNTED AS PER SPECIFICATION SHEET.
2. SPECIFICATION SHEET TAKES PRIORITY OVER R & D SHEET.
3. BOILER DESIGN CODE ASME SECTION __I__.
4. BOILER INSULATED & COVERED W/22 GA. STEEL JACKET.
5. ALL DIMENSIONS ARE ±1/2" UNLESS OTHERWISE NOTED.

SUPERIOR BOILER WORKS, INC.
HUTCHINSON, KANSAS

TRIAD

| | |
|---|---|
| CHECKED BY | DATE |
| DRAWN BY | ? |
| BOILER MODEL | 1600—HP |
| SCALE | 1/24 |
| DRAWING No | ? |

THIS DRAWING IS THE PROPERTY OF SUPERIOR BOILER WORKS & SHALL NOT BE REPRODUCED IN PART OR IN WHOLE, & NONE OF ITS INFORMATION SHALL BE REVEALED WITHOUT PERMISSION OR TO THE DETRIMENT OF THE OWNER. IT MUST BE RETURNED UPON REQUEST.